## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **ALAINA DANIELS,**<br><br>                    **Plaintiff,**<br><br>        **v.**<br><br>**SPEYER LEGACY SCHOOL,**<br><br>                    **Defendant.** | **Case No. 1:21-cv-1747 (DLC)**<br><br><br>**AMENDED COMPLAINT**<br><br><br>**Jury Trial Demanded** |

## PRELIMINARY STATEMENT

1.      This is an action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.; the New York State Human Rights Law, N.Y. Exec. Law § 296; and the New York City Human Rights Law, N.Y.C. Admin. Code § 8-107 et seq.

2.      Defendant Speyer Legacy School ("Speyer" or the "school") hired Plaintiff Ms. Alaina Daniels, who is a transgender woman, as a teacher, to express its and its community's purported commitment to diversity and inclusion.

3.      Speyer represented itself to Ms. Daniels as a progressive school committed to diversity and inclusion. However, for six months, Ms. Daniels experienced escalating, unrelenting discrimination and harassment by Speyer's administrators, her coworkers and the students' parents because of her status as a transgender woman.

4.      It began with minor statements and innuendos and disparate treatment that would not be accorded a cisgender (non-transgender) female teacher, and gradually increased until it became intolerable to any reasonable transgender woman.

5.      Speyer knowingly allowed and perpetuated a hostile environment based on sex. The workplace was permeated with discriminatory intimidation based on sex that was sufficiently severe and pervasive to alter the conditions of her work environment.

6.      In addition to insults and physical assaults because of her sex, she was falsely accused of serious wrongdoing by parents based on anti-transgender bias. The school, knowing the accusation to be false, created and participated in a lengthy sham investigation that subjected Ms. Daniels to great emotional distress.

7.      The school allowed influential parents to engage in defamatory and degrading behavior with no consequences, and indulged their whims to the detriment of the students.

8.      The working conditions were so discriminatory that Ms. Daniels had no choice except to resign from her teaching position to escape the intolerable working environment, as set forth below.

## PARTIES

9.      Ms. Daniels is a resident of New York, New York.

10.      Ms. Daniels  was employed by Speyer as a teacher from August 28, 2019 to March 3, 2020.

11.      Defendant Speyer is an education corporation granted a charter by the University of the State of New York Education Department, located at 925 9th Avenue in the city, county and state of New York, and is a K-8 elementary and middle school for gifted learners five to fifteen years of age.

12.      Speyer employs fifteen or more employees.

2

13.     At all relevant times, Speyer has continuously been an employer engaged in an industry affecting commerce within the meaning of Sections 701(b), (g) and (h) of Title VII, 42 U.S.C. §§ 2000e (b), (g) and (h).

14.     At all relevant times, Speyer has continuously been an employer as that term is defined in N.Y. Exec. law §292.5.

15.     At all relevant times, Speyer has continuously been a person, employer and covered entity within the meaning of New York City Human Rights Law § 8-102.

## PROCEDURAL HISTORY

16.     Ms. Daniels filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on November 25, 2020.

17.     The Charge of Discrimination named Speyer as respondent.

18.     The Charge of Discrimination alleged violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.; the New York State Human Rights Law, N.Y. Exec. Law § 296; and the New York City Human Rights Law, N.Y.C. Admin. Code § 8-107 et seq.

19.     On November 30, 2020 the EEOC issued Ms. Daniels a Notice of Right to Sue.

20.     Ms. Daniels took all necessary steps to exhaust her administrative remedies.

21.     Ms. Daniels took all necessary steps to fulfill all conditions precedent to the commencement of this lawsuit.

## JURISDICTION AND VENUE

22.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because the action is based on Title VII of the Civil Rights Act and under 28 U.S.C. § 1337 because the action is based on a federal statute regulating commerce.

3

23.     Venue is proper under 42 U.S.C. § 2000e-5(f)(3) because the unlawful employment practices are alleged to have been committed in the city, county and state of New York, which is within the Southern District of New York.

## FACTS

**Ms. Daniels was hired under false pretenses regarding diversity and inclusion and treated differently from cisgender female teachers from the start.**

24.     On June 10, 2019, after seven years of teaching at Manhattan Country School, that school offered to extend Ms. Daniels' contract as a Science Teacher for another year, beginning September 1, 2019.

25.     In the summer of 2019, Ms. Daniels was teaching a summer robotics course for Johns Hopkins University's Center for Talented Youth, which had rented Speyer's premises for their summer NYC courses.

26.     Seeing Ms. Daniels working with her robotics course students as they controlled robots that roamed the corridors, representatives of Speyer approached Ms. Daniels to invite her to interview for a 3rd and 4th grade science teacher position.

27.     On July 3, 2019, Lawrence T. Donovan, Jr., Head of Speyer, interviewed Ms. Daniels for a potential teaching job, stating that Speyer was weak at building a diverse, inclusive community, that the School was committed to building a diverse, inclusive community, and that Ms. Daniels would have an important role in building a diverse, inclusive community.

28.     He expressed his commitment to implementing an affinity group for lesbian, gay, bisexual, transgender and questioning ("LGBTQ") students, as well as an affinity group for LGBTQ faculty and staff. He intended for Ms. Daniels to serve in one or both the LGBTQ affinity groups.

29.     Ms. Daniels was interested in playing an important role in helping Speyer build a more diverse and inclusive community.

30.     Much to Ms. Daniels' surprise, Mr. Donovan remarked, "I couldn't walk in those heels," in reference to Ms. Daniels' shoes.

31.     This sex-based remark regarding Ms. Daniels' shoes was said to Ms. Daniels because she is a transgender woman, and would not have been said to a cisgender woman. It confirmed to Ms. Daniels that Mr. Donovan did not understand diversity issues of transgender people. Nonetheless, she felt that she could make a positive difference at the school given his encouragement about joining the Speyer diversity committees.

32.     On July 11, 2019, Ms. Shiva Behradnia, Head of Lower School at Speyer, interviewed Ms. Daniels. She also stated that she and Mr. Donovan and the school were strongly committed to diversity. She noted that the school had consulted with Diversity Directions LLC, a diversity and inclusion consultant for independent schools, which produced a significant report regarding diversity at the school.

33.     She referenced the school's Kaleidoscope Committee of Speyer Parents Association, as well as the Diversity Committee of the Board of Trustees, and stated that these groups demonstrate the school's welcoming of diverse perspectives. Ms. Behradnia also stated that Ms. Daniels' background in diversity and inclusion made her "really what Speyer is looking for."

34.     A few days later, on June 17, 2019, Ms. Daniels was running to the copier while her middle school class was building robots unattended, when Ms. Behradnia stopped her, said they wished to offer her the job, and asked her what salary she would expect, demanding an answer in the moment.

35.     This seemed odd, but Ms. Daniels, as requested, told her the range in which she would expect her salary to fit, and Ms. Daniels ran off to complete her task.

36.     That afternoon, thinking better of the conversation, Ms. Daniels sent an e-mail to Ms. Behradnia to say that she felt a need to explain her hurried answer, and noting that she was somewhat dismayed at the time by being stopped in the hallway to negotiate her salary.

37.     Ms. Daniels told her in the email that there was an earlier conversation with Mr. Donovan regarding salaries typical of New York State Association of Independent Schools ("NYSAIS") schools, and that she had named a figure in that range.

38.     The offer was withdrawn and the position given to another person.

39.     About a month later, Ms. Daniels learned about another position at the school, so she e-mailed Mr. Donovan to ask whether it were true that Speyer sought a 5th and 6th grade science teacher. He interviewed her a few days later for the job

40.     Strangely, he scolded her because her email to Ms. Behradnia showed, according to him, that she is not a "team player."

41.     Upon information and belief, he had a bias that women should not be assertive, because why else would he be scolding Ms. Daniels for simply telling Ms. Behradnia that she was dismayed and wanted to provide an explanation.

42.     Mr. Donovan said that Ms. Behradnia's act of stopping Ms. Daniels in the hall in the midst of a busy school day was not in accord with the school's customary approach to salary negotiation, which was usually a more formal process.

43.     Ms. Daniels then understood that Ms. Behradnia's actions were very unusual for the school, and realized that Ms. Behradnia had treated her unprofessionally, and differently from other applicants not in her protected category. She would not have stopped other applicants in the hall

6

for an impromptu salary negotiation, but rather would have followed the school's customary approach to salary negotiation. The difference between Ms. Daniels and the other applicants is that Ms. Daniels is transgender.

44.     Nonetheless, she was offered the job on August 27th, which she accepted and attended orientation the next day.

**Speyer learned of Ms. Daniels' raising of prior concerns regarding discrimination at her orientation, causing Speyer to retaliate for having done so. Staff also expressed discriminatory views regarding sexual harassment at the orientation.**

45.     That was the third day of the school's annual faculty/staff orientation, and that day's activities began with class on preventing sexual harassment with about 50 people participating.

46.     Upon information and belief, The Speyer School administration became conscious at that time of prior protected activity by Ms. Daniels, although Plaintiff does not know what exactly was communicated or learned by them.

47.     The sexual harassment training included a breakout session where small groups of the participants discussed a hypothetical harassment situation. During Ms. Daniels' breakout session, the school nurse stated that sexual harassment does not exist or is not real because it is a comprised only of an interpretation of real events, and that people who complained of harassment usually regretted it. Ms. Daniels was surprised and, frankly, alarmed that her working environment included a staff member denying that sexual harassment is real -- especially a staff member in charge of students' health and wellbeing.

**Ms. Daniels was treated differently from other teachers in the offer and contract because of her prior protected activity regarding complaints of sex discrimination.**

48.     On September 3, 2019, Mr. Donovan presented a contract, bearing his signature, to Ms. Daniels to sign. The contract contained, on a separate page, an "Addendum to the Contract." The Addendum to the Contract stipulated that Ms. Daniels must "work in a collaborative and congenial nature with the other members of the science department."

49.     Upon information and belief, no other faculty member at Speyer was asked to sign such an Addendum to the Contract.

50.     Upon information and belief, the Addendum to the Contract was included because of Mr. Donovan's sex-based mistrust of Ms. Daniels as too "aggressive" and not a "team player."

51.      Upon information and belief, the Addendum to the Contract was included also because of prior protected activity by Ms. Daniels of which The Speyer School administration previously became conscious.

52.     Ms. Daniels had not told Speyer that she had raised discrimination concerns at her prior school because she felt this was private information. Upon information and belief, Mr. Donovan and/or Scott Molin, the school's Chief Financial and Operating Officer, became conscious of Plaintiff's prior protected activity, causing them to be on guard with regard to Ms. Daniels because of her raising prior discrimination concerns.

53.     Although she felt that the Addendum was in retaliation for her raising discrimination concerns at a previous school, she agreed to sign if an option to negotiate salary for the subsequent year was included.

8

**Ms. Daniels experienced sexually harassing language, physical touching and differential treatment based on her gender identity and sexual orientation, as well as hostility towards other transgender and cisgender women and girls.**

54.     On September 17, 2019, Ms. Daniels, Ms. Behradnia, and Marc Brea, a math specialist, were together in Mr. Brea's office. Ms. Behradnia asked Mr. Brea to carry a heavy jug of water. Mr. Brea replied, "There is a pretty woman in the room. Just because she is wearing heels doesn't mean you should ask me not her. This is sexual harassment."

55.     Ms. Behradnia laughed, but Ms. Daniels understood that Mr. Brea was judging her looks and referencing her physique, as a former NCAA swimmer standing 5 feet 11 inches, and she felt offended, as would any reasonable transgender woman, by being called out because she did not fit Mr. Brea's stereotypical idea of a woman being petite.

56.     A few days later, on September 20, 2019, a school director pointedly told Ms. Daniels that "genitals and gender are inseparable" and that students should be separated in private places like bathrooms and sex ed in accordance with their genitals, implying that Ms. Daniels is a man.

57.     She found this offensive, as would any reasonable transgender person.

58.     In early September, Mr. Donovan again joked to Ms. Daniels that he "could not walk in those heels."

59.     Mr. Donovan would certainly not have made this comment to a faculty or staff member who was a cisgender woman, but did so only because of Ms. Daniels protected category, implying that she is a man in heels.

60.     A reasonable transgender person would be – and Ms. Daniels was – offended by Mr. Donovan's remark.

61.     Much of the faculty, including most of the cisgender men, treated Ms. Daniels differently because she is transgender, speaking to her minimally or not at all, and suggesting that they had a hard time accepting her.

62.     For example, when Ms. Daniels would say hello to Mr. Molin, he would reply routinely with little more than a grunt. He did not act that way towards other faculty.

63.     Upon information and belief, Mr. Molin treated her differently because she is transgender, and he had some bias toward transgender people.

64.     A reasonable transgender person would be – and Ms. Daniels was – offended by this different treatment.

65.     Mr. Brea was also uncomfortable and unwelcoming toward Ms. Daniels through body language and silence, because he too, had some biases and prejudices toward transgender people, as evidenced by his previous odd comment about her being able to carry a heavy water jug.

66.     A reasonable transgender person would be – and Ms. Daniels was – offended by Mr. Brea's differential treatment.

67.     Rosco Williams, Interim Director of Security, on the other hand, flirted with and hugged Ms. Daniels inappropriately and in a sexual manner, in front of other staff, in a way that a cisgender female teacher would not be treated, because he had some biases and prejudices about how to act towards transgender women. A common prejudice is that transgender women are hypersexual and open to such treatment.

68.     Whatever Mr. Williams may have thought he was doing, Ms. Daniels is a well-respected science teacher who was teaching at a school for children whose advanced intelligence gives them special learning needs.

69.     A reasonable transgender person would be – and Ms. Daniels was – offended by being spoken to and physically touched as a hypersexual stereotype rather than as the professional that she is.

70.     Sometime in September 2019, a member of the science department discussed with Ms. Daniels a former student, not from Speyer, who was a transgender girl.

71.     The faculty member stated that the student had been bullied at the other school, and stated their support for the girl, but constantly misgendered the transgender girl using the pronoun, "he."

72.     Misgendering is an insult to a transgender person, deeply hurtful, and an attack on the central aspect of their identity – their sex – that has been a source of struggle in their lives for years or decades.

73.     A reasonable transgender person would be – and Ms. Daniels was – hurt, upset and insulted by hearing a faculty member misgender repeatedly another transgender person, especially a student who the faculty member was charged with protecting.

74.     One day in October 2019, a director asked Ms. Daniels, "How can you be a lesbian if you're trans?"

75.     A reasonable transgender person would be offended by a colleague questioning their sexual orientation based on the presumption that transgender women transition in order to please men, and Ms. Daniels was offended.

76.     Manuel Vallejo, on staff in the kitchen, asked Ms. Daniels, "Why did you transition if you like girls? That makes no sense."

77.     This too was offensive.

78.     Then another teacher stated in a corridor of the school open to students that Ms. Daniels' "knockers" were not "real," also an offensive statement.

11

79.     Again in October 2019, a Speyer admissions staff member remarked to Ms. Daniels that a transgender person does not become a "real woman" until she gets gender confirmation surgery, stating that the gender identity of transgender youth could not be respected because they are not allowed to access surgery until adulthood. The remark had the intent and effect of asking a question about whether Ms. Daniels had gender confirmation surgery, and insulting her if she had not.

80.     A reasonable transgender person would be -- and  Ms. Daniels was -- offended by this blanket assertion that transgender people can't be "real" or their gender identity respected unless they have some kind of surgery and as well as an implied inquiry about Ms. Daniel's surgical status.

81.     In late October 2019, Mr. Williams referred to Ms. Daniels as "sexy lady," which she found offensive.

82.     In late October, one teacher taught a lesson about "boy parts" and "girl parts," teaching that only genitalia defines gender. There were children who had non-stereotypical gender expressions in the class, some of whom may be transgender. Speyer allowed this content to be taught to the children, and a transgender youth listening to this is being told that they cannot have a gender identity apart from their genitalia. For a supposedly progressive school, such as Speyer, it was a lesson in how not to support and affirm transgender youth.

83.     A reasonable transgender person would be offended if the school where she worked asserted as a fact through its curriculum that her gender identity was not real, and Ms. Daniels felt that quite keenly.

84.     In late October, a director told Ms. Daniels, "You shouldn't be wearing that tiny dress; it's cold out."

85.     A reasonable transgender woman would be offended by a man stating that a dress is too revealing, even under the guise of raising concerns about the temperature.

86.     On October 25, 2019, Ms. Daniels co-led a 5th Grade field trip to Central Park with the two other 5th Grade advisors, with a male guide hired by Speyer to give the students a foraging tour of Central Park, as he had during the past four or five years.

87.     During the tour, he stared at Ms. Daniels in a leering manner.

88.     He was also repeatedly touching the students without their consent, especially the faces and hair of the cisgender 10- and 11-year old girls whom he deemed to be attractive. He grabbed one student without warning and twirled her in a dance.

89.     Ms. Daniels told the student, "It looks like he is making you uncomfortable by touching you. You are allowed to ask him to stop." The student then asked him to stop touching her. He ignored her requests and continued to touch students, so Ms. Daniels sent a text to her colleague to silently advise what was going on, as she had chosen the guide and worked with him for years.

90.     One colleague then spoke up to him and asked him to stop touching the students, and he mostly stopped touching the girls but continued touching the boys.

91.     He then told an extended joking story about Greek mythology involving sex and rape to these fifth grade students.

92.     While walking out of the park at the end of the trip, he walked quite closely next to Ms. Daniels, kept repeatedly touching her side, thigh, arm and back, called her out as "remarkable," as if she were some sort of specimen in a zoo, and asked her invasive personal questions about her past, including about her deadname (former name given at birth), all of which a reasonable transgender woman would consider offensive.

93.     Upon returning to Speyer, Ms. Daniels and her colleagues reported the incident to Michele Cristella, head of middle school, and James Grimaldi, the recently hired school psychologist.

94.     It was decided to not go on a field trip with the guide again, but no other steps were taken.

95.     On October 28, 2019, Ms. Daniels, assisted by her colleagues, led a community meeting with the fifth graders about the issue to give the students the opportunity to process their feelings.

96.     From her significant experience teaching about socio-emotional issues, consent, sexual harassment and sexual assault, Ms. Daniels knew that this was best practices.

97.     During the meeting, many of the girls spoke up to share that they had felt uncomfortable but didn't want to speak up for fear of hurting the guide's feelings.  The teachers, including Ms. Daniels, also shared that they were uncomfortable speaking up.

98.     Upon information and belief, the guide had been inappropriately touching Speyer Legacy students for years.

99.     In early November a director called Ms. Daniels, "pretty lady," which she found offensive as a comment on whether or not he thought her looks were sexually attractive to him.


**Ms. Daniels was criticized for trying to join the diversity committees that she had been told by Mr. Donovan that she would be a part of if she came to Speyer. She was not given the opportunity to change Speyer's weak and ineffective diversity culture that Mr. Donovan had promised in soliciting her to join the Speyer staff.**


100.    On October 17, 2019, Ms. Daniels emailed two members of Speyer Board of Trustees who were the co-chairs of the Board of Trustees' Diversity Committee to volunteer to join the Diversity Committee.

101.    After an initial conversation, they ignored her. They later told Ms. Daniels that Mr. Donovan and Ms. Berhadnia had made nominations to the committee earlier that fall.

14

102.    Ms. Daniels told them that she had informed Mr. Donovan and Ms. Behradnia of her interest in joining the Diversity Committee during her interviews in July, but Mr. Donovan replied by email that people were appointed to the committee based upon their "identified interest in working on diversity initiatives" or who had "explicitly asked to be included in such initiatives." Mr. Donovan also stated that he had made appointments based on the "diversity of folks represented." This reply ignored the fact that Ms. Daniels had expressed interest, and there were no transgender people or lesbians on the committee, so by his own standards Ms. Daniels should have been considered.

103.    Ms. Daniels thought perhaps he had misunderstood, so she sought inclusion in a further email, but on November 1, 2019, Mr. Donovan told Ms. Daniels that she could not join the Diversity Committee, that members of the Board of Trustees were surprised or offended that Ms. Daniels had approached them to request to be part of the Diversity Committee and that she had replied to Mr. Donovan questioning his decision, stating that a Trustee used a vulgar word that he would not repeat to her to characterize Ms. Daniels. He told her she was too aggressive, that the Diversity Committee members agreed, and she should not have reached out to the Board's diversity committee to offer her participation.

104.    Ms. Daniels understood that the Trustees and Mr. Donovan felt that she had violated female gender norms by stepping forward to ask, even if she did it nicely, for inclusion as a transgender woman.

105.    In essence, the Board of Trustees at Speyer refused to allow Ms. Daniels a place on the Diversity Committee because her diversity was the "wrong" kind of diversity.

106.    She had been excited to participate on the Diversity Committee, as she was told she could at her interviews, and then, when she reached out to the people in charge of the committee to

15

request participation, she received this baffling series of answers and a criticism of her gender performance as too aggressive.

107.    A reasonable transgender person would – and Ms. Daniels did – realize that Speyer lied about its commitment to diversity and further, that the very institution that had hired her, did not welcome and even disliked her because of who she is.

108.    A reasonable transgender person would be – and Ms. Daniels was – deeply hurt by this treatment.

**The hostile environment towards transgender and cisgender women and girls intensified.
Influential parents were permitted to engage in behaviors hostile to cisgender and
transgender women and girls.**

109.    At about this time, Mr. Donovan and Mr. Molin talked to Ms. Daniels about a "man who wears tight pants so that you can see his male parts." They repeatedly engaged in this conversation with her.

110.    In early November 2019, a group of eighth-grade boys harassed several eighth-grade girls, calling them derogatory words including "bitch" and "cunt," and one eighth-grade boy spiked an eighth-grade girl's drink with Advil.

111.    The harassing boy to whom the other harassing boys looked for leadership was the son of a parent with special clout and influence at Speyer.

112.    While the boys were suspended by a female administrator, the girls who had reported this faced significant social pressure to recant the allegations, particularly the girl whose drink was spiked.

113.    Ultimately, the girls did recant under pressure, and Mr. Donovan forced the female administrator who had suspended the boy to apologize to the influential parent for the suspension,

although of course, the female administrator was well within her rights to do so, thus further perpetuating an atmosphere of gender discrimination.

114.    On November 7, 2019, during a parent-teacher conference, another influential parent gave Ms. Daniels a back and shoulder rub – without solicitation – and told Ms. Daniels that she was his "favorite." This made her very uncomfortable, but she was reluctant to tell the parent to stop touching her because she did not want to get into a row with him.

115.    Ms. Daniels began to understand from his facial expression that he intended for Ms. Daniels to understand that he found her sexually arousing. This made her extremely anxious as well as disgusted by his actions, and she found herself frozen by this aggressively sexual action taking place in a tiny office. Ms. Daniels finished the meeting, but was very shaken.

116.    Then, on November 8, 2019, during a parent-teacher conference, a parent stated to Ms. Daniels that historic "Gypsies" were dirty, violent thieves who mutilated their children so that they would grow into better beggars. Ms. Daniels expressed surprise at this racist remark, but before she could say more, he elaborated that "Gypsies" resemble "African Americans," and since these groups are no longer mistreated it is wrong of them to be violent, angry people. The parent's son had made similar remarks in class.

117.    Given Mr. Donovan's criticisms of her every attempt to make the school a better place, and the punishment meted out to the female administrator who had to apologize to a parent, and given the parents' acting entitled to be prejudiced and biases, Ms. Daniels deemed it futile and dangerous to her position to more strongly advise the parent that such racist sentiments are highly offensive and inappropriate.

118.    On November 8, 2019, during a parent-teacher conference, a male parent repeatedly referred to Ms. Daniels using male pronouns – misgendered her – for an entire conference. Ms.

Daniels sat mute with embarrassment, and did not say anything for fear of Mr. Donovan's reaction about her "aggressive" behavior.

119.   A week later, on November 13, 2019, Ms. Daniels reported the incident with the parent massaging her at a meeting, the racist remark of the second parent, and the misgendering by the third parent to Mr. Molin. Speyer took no prompt or effective action to address these issues.

**Speyer perpetuated an environment that made it unsafe to be a transgender female teacher and to support LGBTQ students who requested support in the face of bullying.**

120.   On November 14, 2019, Ms. Daniels and another 5th grade advisor taught a lesson about identity, sexism and bullying.   A parent complained that Ms. Daniels should not have acknowledged that she is a transgender woman and a lesbian. The school allowed Ms. Daniels to respond to the criticism but she was nonetheless prevented from teaching the lesson as planned again. There were regular discussions, especially with Mr. Donovan, about needing to please parents and not be "too political," that diversity work was seen as too political, and the clear implication conveyed to Ms. Daniels was that teaching a lesson about identity, sexism and bullying was too political.

121.   At around the same time, a sixth grade student, the child of a Trustee, called a 5th grade student a "fag."

122.   On November 21, 2019, Ms. Daniels asked the fifth grader who had been called "fag" if he would like to check in, and he said yes. They were standing on "the Boulevard," the large open public center portion of Speyer that functions as a corridor and as a community gathering place inside the school. It is an "indoor yard," complete with wide wooden pathways, artificial turf, deck chairs, and study tables and is visible from all classrooms as well as the library.

123.    The fifth grade student reported the incident to Ms. Daniels, and also informed her that he believed he is bisexual.  At the time, Ms. Daniels and the student were sitting at a public table on the Boulevard as staff remembers and students occasionally strolled by.

124.    The next day, Ms. Daniels reported this to Mr. Donovan and Ms. Cristella.  Ms. Cristella stated that she had watched the entire conversation from inside the library and commended Ms. Daniels on her care for the student's well-being.

125.    Ms. Daniels' care and concern for a student's well-being in the face of bullying and social pressures regarding sexual orientation was later used against her.

126.    On November 22, 2019, one of the school's directors sent an email to the entire faculty misgendering a non-binary staff member, referring to them as a man.

127.    Again, Ms. Daniels was offended by the misgendering of one of her colleagues in an email circulated to the entire faculty and staff.


**Ms. Daniels was told by Mr. Donovan that she should stop complaining and taking up too much time and space. When she reported a physical assault by a staff member, she was told that she was probably drunk and acting provocatively.**

128.    At the end of December, Ms. Daniels asked Mr. Donovan and Ms. Cristella about her job performance and whether or not her one-year contract would be extended.

129.    Mr. Donovan told Ms. Daniels that she had been doing an excellent job at all of the items on the Addendum to the Contract.

130.    However, he also said that Ms. Daniels "asked too many questions" and "took up too much time and space" especially with regard to her concerns about diversity and inclusion.

19

131.    On December 19, 2019, Ms. Daniels was at Speyer holiday party which had moved from the school cafeteria to Rise Bar and Lounge around 8:00 p.m.

132.    At or about 8:30 p.m., while Ms. Daniels was dancing with a staff member of the school, he put his hands about Ms. Daniels' neck, and choked her such that she could not breathe for approximately 30 seconds, although she is not sure of the exact timing. This put her in terror for her life.

133.    Ms. Daniels pulled out of the man's grip and went to leave the party as quickly as possible.

134.    Ms. Daniels was very visibly shaken, upset and scared.  Several staff members noticed, and Mr. Molin asked if anything was wrong. She was too frightened to explain. Despite seeing her visibly shaking, Mr. Molin did not follow up about the incident.

135.    The next day, Ms. Daniels reported the incident to the manager of the person who choked her at the party. The manager said that Ms. Daniels was at fault for the choking because she had gotten too drunk and danced in a provocative way, and that the manager wanted to protect the person who choked Ms. Daniels.

136.    Ms. Daniels was now feeling constantly concerned for her physical safety on the premises of the school, which caused panic attacks about coming to school each day.

137.    On January 14th, 2020, Ms. Daniels met with Mr. Donovan and Ms. Cristella, where she informed Mr. Donovan and Ms. Cristella of the choking incident during the holiday party at Rise Bar.

138.    In response to being informed of the incident, Mr. Donovan suggested that the choking may have been a sign of affection, which was very upsetting to Ms. Daniels. Mr. Donovan also suggested that Ms. Daniels may have been too intoxicated.  In fact, Mr. Molin had purchased the only drink Ms. Daniels consumed at Rise Bar.

139.    Mr. Donovan also suggested that since it had been almost a month since the incident, Ms. Daniels had taken took too long to report the complaint.  Ms. Daniels informed Mr. Donovan that she had been reluctant to disclose given the atmosphere at the school and Mr. Donovan's previous comments, especially about the dress code.  Mr. Donovan replied with a commentary about "male anatomy."

140.    During the conversation, Ms. Daniels provided Mr. Donovan with a written complaint regarding the discriminatory and harassing events that had been occurring at the school.

141.    Mr. Donovan expressed regret and sadness about his previous actions as well as about the number of incidents that had occurred at Speyer.

142.    Mr. Donovan also stated that in the past, he would have had a "prurient interest" in transgender people because they were a "novelty."

**Speyer provides an error-filled presentation to parents about transgender people during a talk on sexual education.**

143.    The next day, shortly before 5:30 p.m., Ms. Daniels attended a Speyer Middle School Social and Emotional Learning event for parents on the topic of explaining human reproduction and sexuality to middle schoolers.

144.    On the way to the event, Ms. Daniels crossed the Boulevard, approaching Mr. Donovan and several parents who were having a conversation while they were enroute to the event.

145.    Just as Ms. Daniels passed, Mr. Donovan reached the end of a joke, whose punchline was, "your sister is a whore."

146.    That Mr. Donovan delivered this punchline less than five minutes before the start of an event grounded in social and emotional learning and focused upon human sexuality and hosted by

Speyer, which holds itself out as committed to diversity and inclusion, upset Ms. Daniels greatly, given the fears for her physical safety that she had been experiencing, and Mr. Donovan's minimizing her experience by suggesting she should have considered the choking as a sign of affection.

147.    At 5:30, Speyer's Middle School Social and Emotional Learning event for parents on the topic of explaining human reproduction and sexuality to middle schoolers began.

148.    The presenter, Dr. Grimaldi, the school psychologist, made a hash of the lesson, which was supposed to provide appropriate instruction to the parents regarding, among other things, transgender identity, and there may have been parents of transgender students in the audience who were learning about this from Dr. Grimaldi.

149.    Dr. Grimaldi had reached out to Ms. Daniels for help with his presentation, but then he failed to contact her any at time thereafter.

150.    He made egregious errors that any minimally competent teacher, let alone a psychologist, would have known to avoid. He repeatedly used the word, "transgender**ed**," which is considered pejorative.

151.    As explained in a guide published by GLAAD, a well-known advocacy organization, "transgendered" should not be used.

152.    "The adjective transgender should never have an extraneous '-ed' tacked onto the end. An '-ed' suffix adds unnecessary length to the word and can cause tense confusion and grammatical errors. Omitting the suffix also brings transgender into alignment with the terms, lesbian, gay, bisexual, and queer. You would not say that Elton John is 'gayed' or Ellen DeGeneres is 'lesbianed,' therefore you would not say Chaz  Bono  is  'transgendered." GLAAD Reference  Guide,  10th  Edition,  available  at glaad.org/reference.

153.    He continually erased and ignored transgender identity by constantly referencing only "male and female bodies," "the male and female reproductive systems," "biological sex," and ignoring non-binary pronouns. The presentation effectively communicated no correct information about transgender people. He also said that his presentation was validated by Ms. Daniels, when in fact she had nothing to do with this error-filled lecture. Ms. Daniels was mortified and offended by Dr. Grimaldi's implication that she had approved this.

154.    After the presentation, multiple parents suggested that Ms. Daniels and Dr. Grimaldi work together on the school's talks regarding discussing sexuality with middle schoolers. That left Ms. Daniels very hopeful that she would be able to make a difference in the diversity and inclusion issues that she was induced to come to the school to address.

155.    After the presentation, Ms. Daniels told Dr. Grimaldi that the proper term is transgender, not transgendered.

156.    He said that he would try to remember that, but he did not seem to recognize that his fallacious lecture was a problem, nor did he seem particularly interested in learning from transgender or LGBTQ educators. He did not contact her for any collaboration.

**A meeting about Ms. Daniels' complaints ends badly.**

157.    On January 17, 2020, Mr. Molin, Ms. Cristella and Ms. Daniels met in a conference room to discuss Ms. Daniels' complaints.

158.    Mr. Molin and Ms. Cristella told Ms. Daniels that, in order to be hired again, she would have to work more "congenially," which further discussion confirmed was a retaliatory measure meant to stop her from making complaints about the problems she was experiencing on the basis of her sex.

159.    Ms. Daniels pointed out that she had been treated differently since a certain point in the beginning of the year, at which point The Speyer School administration became conscious of her prior protected activity at another school. Ms. Daniels believed that part of her differential treatment came from retaliatory motives based on her prior protected activity at another school.

160.    In response, Mr. Molin said "fuck," in a louder but neutral tone of voice, which she recognized as an interjection of shocked surprise. He looked angry and scared.

161.    Ms. Daniels reminded them that Mr. Donovan had promised to have her speak to the school about her experiences as a transgender woman, that Mr. Donovan had said she could speak to the Diversity Committee, and that she could be on the Diversity Committee. All of these were later refused and she was criticized for attempting to do so.

162.    Mr. Molin and Ms. Cristella said nothing in response to Ms. Daniels' complaints, and the meeting ended.

163.    After the meeting, Ms. Cristella expressed surprise, regret and sympathy about how Mr. Molin had treated Ms. Daniels.


**Influential parents falsely attack Ms. Daniels because she is transgender and a lesbian and falsely accuse her of sexually harassing male students. The school, although aware that Ms. Daniels had done nothing wrong, took the side of the parents and subjected Ms. Daniels to accusations and interrogation and forbade her from being alone with the student. At this point, the hostile environment based on sex and retaliation became so intolerable that it affected her emotional health and she was forced to resign.**

164.    On January 27, 2020, two students, one of whom had told Ms. Daniels he is bisexual, were in lunch detention, managed by Ms. Daniels. They had a well-established pattern of making

mischief when they were together, such as running Google searches for "black face" or "AK-47" or writing inappropriately on the chalkboard.

165.    At lunch detention, students were required to sit at the teachers' table in silence while the rest of the students, faculty and staff eating lunch in the cafeteria enjoyed the privilege of speaking and being social.

166.    The two students were seated in silence at either end of the teachers' table with Ms. Daniels. They went to the restroom together. The boy's restroom had no door, so Ms. Daniels could see their actions from the teacher table. (It is a common practice in school settings to leave doors off of restrooms so children can be watched to prevent misbehavior.) The boy who had told Ms. Daniels that he was bisexual student was standing at a sink and talking to the boy in the stall.

167.    Ms. Daniels went to the restroom door and told the one at the sink to go sit down.

168.    He said, "No, not until __ is done. You shouldn't be in the boys' bathroom."

169.    Ms. Daniels remained in the doorway of the restroom. It is generally accepted practice at Speyer for female teachers to be permitted to go into the boy's restroom if necessary. Furthermore, Ms. Daniels was within the view of twenty teachers and staff members who were eating lunch and working in the cafeteria. She was also in view of about 80 students. Ms. Daniels did not enter the restroom at any point, and security cameras in the room can confirm that Ms. Daniels did not enter the restroom at any point.

170.    At the end of the day, Ms. Daniels emailed both parents about their children's misbehavior. Both Ms. Cristella and Dr. Grimaldi approved the emails before they were sent.

171.    Shortly after, the parents of the student who had told Ms. Daniels he was bisexual, emailed Mr. Donovan and Ms. Cristella, falsely accusing Ms. Daniels of following the children to the restroom and remaining there with the intent of sexual harassment.

25

172.    They also falsely alleged that Ms. Daniels had previously encouraged their son to be gay, discussed her sex life with him, asked for names of other gay children, and mistreated him in class.

173.    The student had previously admitted to Ms. Daniels and Dr. Grimaldi that his parents had convinced him that Ms. Daniels had encouraged him to be gay, and that he was not gay.  Ms. Daniels had recognized that this might become a problem and repeatedly asked Dr. Grimaldi to make detailed notes on the meeting.  Dr. Grimaldi failed to do so.

174.    On January 28, 2020, the parents met with Dr. Grimaldi, Ms. Cristella and, on information and belief, Mr. Donovan. Just prior to the meeting, Dr. Grimaldi showed Ms. Daniels the notes he had retroactively taken about Dr. Grimaldi and Ms. Daniel's prior meeting with the boy and asked her to edit them.   Ms. Daniel's removed awkward and borderline offensive language about homosexuality.

175.    The next day, Ms. Cristella and Paul Deards, Deputy Head of School, called Ms. Daniels into an unscheduled meeting telling her she was looking into what happened with her and the fifth grader, stating that she had been accused of impropriety. When asked, Ms. Cristella denied that it was an investigation.

176.    They interrogated her regarding her relationship with the fifth grader for forty minutes, and said that she would henceforth be forbidden from being alone with that child unless another teacher or staff member was present.

177.    Ms. Daniels was horrified because it was clear these false allegations were made against her specifically because these parents objected to having a transgender teacher, and not because of any evidence. In fact, there was evidence to the contrary, in that there were eighty students and twenty teachers and staff watching them, as well as video cameras.

178.   A common prejudice against transgender women is that they are hypersexual and pedophilic. Such false accusations used to be routinely used against gay male teachers, but that has abated in recent years in the US. Now this canard is routinely used against transgender teachers.

179.   This was an accusation of illegal conduct that potentially could merit imprisonment. Because our legal system generally does not house transgender women with cisgender women, such imprisonment is extremely likely to lead to severe bodily harm, sexual assault and solitary confinement. This had the intent and effect of creating great emotional distress and fear in Ms. Daniels.

180.   Ms. Daniels finished her remaining two classes for the day, although she felt sick with fear and disgust at the way she was being railroaded with the consent and acquiescence of the school.

181.   On the next day, January 30, 2020, Ms. Daniels called the school and advised that she was ill and would not be able to teach.

182.   She e-mailed Mr. Donovan and Mr. Molin and asked them about the status of the incident regarding the boy. They advised that Ms. Cristella was conducting an investigation that would be completed within a week.

183.   Because of the great emotional distress she was experiencing at these accusations and the school's consent and acquiescence in suggesting that she was a pedophile who could not be trusted with children, despite her years of excellent teaching, Ms. Daniels emailed in sick each day for a week.

184.   Ms. Daniels asked repeatedly that the investigation be completed timely, noting that all events at Speyer in public spaces such as corridors, were captured on camera.

185.   Mr. Donovan and Mr. Molin told Ms. Daniels that Speyer would withhold her contract until the investigations were completed, intimating there were multiple investigations arising from

multiple complaints by multiple parents against her. They refused to disclose what additional investigations were happening. This continued for a month.

186.    They demanded that Ms. Daniels be investigated by Mr. Donovan, Mr. Molin and Ms. Cristella  in person at Speyer. They demanded that Ms. Daniels be investigated by a private investigator.

187.    Upon information and belief, the parents referenced above falsely told Mr. Donovan at a large parents-teachers association meeting that Ms. Daniels was a danger to children in the school's children in bathrooms.  Upon information and belief, several other parents joined in these false accusations. Mr. Donovan did nothing to address these false accusations or support Ms. Daniels.


**Ms. Daniels' attempts to find a position in a school without a hostile work environment based on sex is thwarted by Mr. Donovan for retaliatory reasons.**

188.    Ms. Daniels attended the  NYSAIS Job Fair To Promote Diversity on February 22, 2020.

189.    Ms. Daniels received multiple initial interviews at the hiring fair. One initial interview was from a school that was very excited about Ms. Daniel's candidacy because she had recently been a consultant and taught a highly successful "Teaching Social Justice in Science Class" workshop for their leadership and science department.

190.    After a very positive initial interview with the Head of School and the Head of the Science department, Ms. Daniels was told to expect a second round interview.

191.    Mr. Donovan was at the fair, and watched as Ms. Daniels spoke at length with this school. Shortly after her conversation with the school, Ms. Daniels saw Mr. Donovan approach the Head of School, hug him, and speak very familiarly for a while. Upon information and belief, Mr. Donovan told them false negative information so that they would not hire Ms. Daniels.

192.    Ms. Daniels was not offered a second-round interview or hired for that position.

193.    The combination of so many discriminatory incidents based on sex as detailed above made it intolerable for Ms. Daniels to continue under those working conditions.

194.    Any reasonable transgender woman would have found these discriminatory working conditions intolerable.

195.    Ms. Daniels experienced substantial emotional distress as a result of these conditions.

196.    Ms. Daniels took leave from Speyer under the Family and Medical Leave Act.

197.    On March 3, 2020, Ms. Daniels resigned from her teaching post at Speyer, advising them that she was doing so because of the intolerable discrimination that she had experienced in the school.

198.    To add insult to injury, she received a letter from Mr. Donovan, who as the person in charge of the school had made her life a living nightmare, stating that he was surprised that she resigned because he had a great commitment to diversity, that he had personally ensured that her concerns were all addressed, and that he thought the environment at the school was very embracing of her gender identity.

199.    In early June, 2020, Ms. Daniels was the finalist for a 6th Grade Science position at another independent school. As the last step in their hiring process, this school asked Ms. Daniels for Mr. Donovan's contact information.

200.    Ms. Daniels expressed surprise at this request as it is not standard NYSAIS procedure.

201.    At the end of the work day on Friday, June 12, 2020, Ms. Daniels emailed the school with Mr. Donovan's contact information. Ms. Daniels also emailed Mr. Donovan that she was the finalist and he would be receiving a contact about the position. On Saturday, June 13, 2020, Mr. Donovan replied thanking Ms. Daniels for informing him.

202.    Early in the morning on Monday, June 15th, Ms. Daniels received a call from her potential immediate supervisor at the school where she was a candidate. Ms. Daniels was informed that her work was "incredibly impressive" and that it was with "deep regret," that she was no longer be a candidate and the school would be continuing its search.

203.    Upon information and belief, Mr. Donovan told the Head of School false negative information so that they would not hire Ms. Daniels.

204.    Ms. Daniels was not hired for that position.

## CAUSES OF ACTION

### COUNT 1

**Civil Rights Act of 1964 § 701 et seq.**
**42 U.S.C.A. § 2000e et seq.**
**Hostile Work Environment Because of Sex**

205.    Ms. Daniels incorporates by reference each foregoing paragraph as if fully stated herein.

206.    Under Title VII, it is unlawful for an employer "to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1).

207.    Ms. Daniels is a member of a protected category with regard to her sex.

208.    Speyer engaged in unlawful discriminatory practices prohibited by § 2000e by discriminating against Ms. Daniels because of her gender and by creating a hostile work environment.

209.    Speyer's Board of Trustees, administration, teachers, staff, and students' parents engaged in a campaign of harassment and discrimination against Ms. Daniels on the basis of sex, and

30

adopted adversarial attitudes and hostile demeanors by ignoring Ms. Daniels' complaints about harassment and participating in the conduct giving rise to her claim.

210.    The harassment was severe or pervasive enough to alter the terms of Ms. Daniels' employment with Speyer.

211.    The effects of the hostile work environment detailed herein were felt by Ms. Daniels daily.

212.    Many events contributing to this hostile work environment occurred within the 300-day period prior to Ms. Daniels' EEOC charge.

213.    A reasonable transgender person in Ms. Daniels' circumstances would – and Ms. Daniels did – consider the working environment to be abusive or hostile.

214.    Speyer was on notice of the hostile work environment and did not undertake prompt, effective efforts sufficient to address it, as detailed above and herein.

215.    This hostile environment unreasonably interfered with Ms. Daniels' ability to perform her job duties, by disrupting her relationship to Speyer and its Board of Trustees, administration, faculty, staff and parents, by the unreasonable criticism and scrutiny of Ms. Daniels' gender which flowed directly from Speyer's failure to take prompt and effective action to stop the hostile work environment, by Ms. Daniels' need to spend time on otherwise unnecessary grievance processes and other means of seeking relief, and her reasonable fear for safety, among other reasons, and created working conditions intolerable to a reasonable person.

216.    As a direct and proximate result of Defendant's unlawful retaliation, Plaintiff has incurred damages including but not limited to lost wages, humiliation, loss of enjoyment of life, emotional distress, damage to their professional reputation, and other pecuniary and non-pecuniary losses.

217.    By engaging in the conduct described above, Speyer discriminated against Ms. Daniels intentionally, knowingly or recklessly with regard to Ms. Daniels' federally protected rights, for which she seeks punitive damages.

218.    As a result of Speyer's unlawful conduct, Ms. Daniels has been damaged as set forth herein and is entitled to the maximum compensation available under the law.

## COUNT 2

### 42 U.S.C. §2000e, et seq.
### Retaliation

219.    Ms. Daniels incorporates by reference the preceding paragraphs as if fully set forth herein.

220.     The effect of Defendant's acts complained of above was to deprive Ms. Daniels of equal employment opportunities as an employee because of retaliation for their complaints of discrimination in violation of Title VII and Title I of the Civil Rights Act of 1991.

221.    By complaining to Defendant about the discriminatory practices and hostile work environment described herein, opposing said practices and hostile work environment directed at them, Ms. Daniels engaged in activities protected by Title VII.

222.    Ms. Daniels's exercise of protected rights was known to Defendant.

223.    Following and because of Ms. Daniels's Title VII protected conduct, Ms. Daniels was subjected to tangible or adverse employment actions.

224.    The actions taken against Ms. Daniels would dissuade a reasonable employee from making or supporting a complaint of discrimination.

225.    By engaging in the conduct described above, Defendant intentionally retaliated against Ms. Daniels with malice or reckless indifference to her federally protected rights to oppose practices that are prohibited by Title VII.

226.    As a direct and proximate result of Defendant's unlawful retaliation, Ms. Daniels has incurred damages including but not limited to lost wages, humiliation, loss of enjoyment of life, emotional distress, damage to their professional reputation, and other pecuniary and non-pecuniary losses.

## COUNT 3

### Civil Rights Act of 1964 § 701 et seq.
### 42 U.S.C.A. § 2000e et seq.
### Constructive Discharge Because of Sex

227.    Ms. Daniels incorporates by reference each foregoing paragraph as if fully stated herein.

228.    Under Title VII, it is unlawful for an employer "to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1).

229.    The effect of the acts by Speyer's Board of Trustees, administration, teachers, staff, and students' parents complained of above was to create an intolerable work environment for Ms. Daniels because of sex.

230.    Ms. Daniels perceived the work environment to be intolerably hostile.

231.    Ms. Daniels left her teaching position at Speyer amid pervasive discrimination on the basis of her sex.

232.    Speyer intentionally created a work environment so intolerable to Ms. Daniels that she was forced to quit her teaching position involuntarily.

33

233.    A reasonable transgender person in the working conditions that Ms. Daniels experienced at Speyer would – and Ms. Daniels did – feel compelled to resign.

234.    Ms. Daniels was subjected to verbal harassment and unwelcome physical touching from administration, teachers, staff, and parents at Speyer.

235.    Ms. Daniels was reasonably fearful for her emotional and physical safety at Speyer.

236.    As a direct and proximate result of the acts and conduct by Speyer complained of herein, Ms. Daniels suffered and will continue to suffer damages including but not limited to economic and pecuniary losses, both past and future, such as income and any other compensation that she was denied because of her sex; severe emotional, psychological and physical stress, distress, anxiety, pain and suffering; the inability to enjoy life's pleasures; and other non-pecuniary losses and special damages.

237.    By engaging in the conduct described above, Speyer discriminated against Ms. Daniels intentionally, knowingly or recklessly with regard to Ms. Daniels' federally protected rights, for which she seeks punitive damages.

238.    As a result of Speyer's unlawful conduct, Ms. Daniels has been damaged as set forth herein and is entitled to the maximum compensation available under this law.

## COUNT 4

**New York State Human Rights Law**
**N.Y. Exec. Law §290 et seq.**
**Hostile Work Environment Because of Sex, Sexual Orientation and Gender Identity**

239.    Ms. Daniels incorporates by reference the preceding paragraphs as if fully set forth herein.

240.    Ms. Daniels is a member of a protected category with regard to her sex, sexual orientation and gender identity.

241.   Speyer's Board of Trustees, administration, teachers, staff, and students' parents initiated and conducted a campaign of harassment and discrimination against Ms. Daniels on the basis of sex, and adopted adversarial attitudes and hostile demeanors by ignoring Ms. Daniels' complaints about harassment by her co-workers, and by actually participating in the conduct giving rise to her claim.

242.   This conduct rose above the level of what a reasonable victim of discrimination with the same protected characteristic would consider petty slights or trivial inconveniences.

243.   Ms. Daniels was subject to inferior terms, conditions and privileges of employment

244.   The effects of the hostile environment alleged herein were felt by Ms. Daniels daily.

245.   Many events contributing to this hostile work environment occurred within the one-year period prior to Ms. Daniels' first EEOC charge.

246.   Ms. Daniels perceived the working environment to be abusive or hostile.

247.   A reasonable transgender woman in Ms. Daniels' circumstances would perceive the working environment to be abusive or hostile.

248.   Speyer was on notice of the hostile work environment and did not undertake prompt and effective efforts sufficient to address it, as detailed herein.

249.   This hostile environment unreasonably interfered with Ms. Daniels' ability to perform her job duties, by disrupting her relationship to Speyer's Board of Trustees, administration, teachers, staff, and students' parents, by the unreasonable criticism and scrutiny of Ms. Daniels' gender which flowed directly from Speyer's failure to take prompt and effective action to stop the hostile work environment, by Ms. Daniels' need to spend time on otherwise unnecessary grievance processes and other means of seeking relief, and her reasonable fear for her safety, among other reasons, and created working conditions intolerable to a reasonable person.

35

250.     As a direct and proximate result of Speyer's unlawful discrimination, Ms. Daniels incurred

damages including but not limited to lost wages, humiliation, loss of enjoyment of life, emotional

distress, damage to his reputation, and other pecuniary and non-pecuniary losses, which damages

would not have occurred but for Speyer's unlawful hostile work environment.

251.     By engaging in the conduct described above, Speyer discriminated against Ms. Daniels

intentionally, knowingly or recklessly with regard to her federally and state protected rights, for

which Ms. Daniels seeks punitive damages.

COUNT 5

**New York State Human Rights Law**
**N.Y. Exec. Law §290 et seq.**
**Constructive Discharge Because of Sex, Sexual Orientation and Gender Identity**

252.     Ms. Daniels incorporates by reference the preceding paragraphs as if fully set forth herein.

253.     Ms. Daniels is a member of a protected category with regard to sex, sexual orientation

and/or gender identity.

254.     The effect of Speyer's acts complained of above was to create an intolerable work

environment based on sex.

255.     Ms. Daniels perceived the working environment to be intolerably hostile based on sex.

256.     A reasonable transgender person in Ms. Daniels' circumstances would consider the

working environment to be intolerably abusive or hostile.

257.     Ms. Daniels was subject to inferior terms, conditions and privileges of employment

258.     Speyer was on notice of the hostile work environment, including actual notice by means of

complaints made by Ms. Daniels as detailed herein.

259.     The effect of the intolerable work environment was such that Ms. Daniels' resignation was

not voluntary and amounts to a constructive discharge by Speyer.

260.    As a direct and proximate result of Speyer's unlawful constructive discharge, Ms. Daniels incurred damages including but not limited to lost wages, humiliation, loss of enjoyment of life, emotional distress, physical injury, damage to their professional reputation, and other pecuniary and non-pecuniary losses, which damages would not have occurred but for Defendants' discrimination.

261.    By engaging in the conduct described above, Speyer caused Ms. Daniels' constructive discharge by creating an intolerable work environment intentionally, knowingly or recklessly with regard to Ms. Daniels' federally and state protected rights, for which Ms. Daniels seeks punitive damages.

### COUNT 6

### NYSHRL §290 et seq.
### Retaliation

262.    Ms. Daniels incorporates by reference the preceding paragraphs as if fully set forth herein.

263.    By complaining to Defendant about the discriminatory practices and hostile work environment described herein, opposing said practices and hostile work environment directed at them, Ms. Daniels engaged in activities protected by N.Y. Exec. Law §290.

264.    Ms. Daniels' exercise of protected rights was known to Defendant.

265.    Following and because of Ms. Daniels' protected conduct, she was subjected to tangible or adverse employment actions.

266.    The actions taken against Ms. Daniels would deter a reasonable employee from making or supporting a complaint of discrimination.

267.     By engaging in the conduct described above, Defendant intentionally retaliated against

Ms. Daniels with malice or reckless indifference to Ms. Daniels' state protected rights to oppose

practices that are prohibited.

268.     As a direct and proximate result of Defendant's unlawful retaliation, Ms. Daniels has

incurred damages including but not limited to lost wages, humiliation, loss of enjoyment of life,

emotional distress, damage to their professional reputation, and other pecuniary and non-

pecuniary losses.

## COUNT 7

### New York City Human Rights Law
### NYCHRL § 8-107, et seq.
### Hostile Work Environment Because of Sex, Sexual Orientation and Gender Identity

269.     Ms. Daniels incorporates by reference the preceding paragraphs as if fully set forth herein.

270.     It is "an unlawful discriminatory practice: (a) For an employer or an employee or agent

thereof, because of the actual or perceived . . . gender, [or] sexual orientation . . . of any person,

to . . . discharge from employment . . . or to discriminate against such person in compensation or

in terms, conditions or privileges of employment." New York City Administrative Code §8-107(1).

271.     Ms. Daniels is a member of a protected category with regard to sex, sexual orientation

and/or gender identity.

272.     Speyer's Board of Trustees, administration, teachers, staff, and students' parents initiated a

campaign of harassment and discrimination against Ms. Daniels on the basis of sex, and adopted

adversarial attitudes and hostile demeanors by ignoring Ms. Daniels' complaints about harassment

by her co-workers, and by actually participating in the conduct giving rise to Ms. Daniels' claim.

38

273.   Ms. Daniels was targeted for harassment and subjected to a hostile work environment because of sex, sexual orientation and gender identity in violation of the New York City Human Rights Law, New York City Administrative Code § 8-107, et. seq.

274.   Ms. Daniels perceived the working environment to be hostile.

275.   A reasonable transgender person in Ms. Daniels circumstances would – and Ms. Daniels did – consider the working environment to be hostile.

276.   The harassing conduct rose above the level of what a reasonable victim of discrimination with the same protected characteristic would consider petty slights or trivial inconveniences.

277.   Defendant is directly liable for the deprivation of Ms. Daniels' rights by exercising its authority to allow, create and perpetuate a hostile work environment based on sex and/or gender identity.

278.   Speyer aided and abetted in the deprivation of Ms. Daniels' rights because of discrimination against them by actually participating in the conduct giving rise to their claim for hostile work environment.

279.   This hostile environment unreasonably interfered with Ms. Daniels' ability to perform her job duties, by disrupting her relationship to Speyer, including the Board of Trustees, administration, teachers, staff, and students' parents, by the unreasonable criticism and scrutiny of Ms. Daniels' gender which flowed directly from Speyer's failure to take prompt and effective action to stop the hostile work environment, by Ms. Daniels' need to spend time on otherwise unnecessary grievance processes and other means of seeking relief, and her reasonable fear for her safety, among other reasons, and created working conditions intolerable to a reasonable person.

280.    As a direct and proximate result of Speyer's unlawful discrimination, Ms. Daniels incurred damages including but not limited to lost wages, humiliation, loss of enjoyment of life, emotional distress, damage to professional reputation, and other pecuniary and non-pecuniary losses.

281.    By engaging in the conduct described above, Speyer discriminated against Ms. Daniels with willful or wanton negligence, or recklessness or a conscious disregard of the rights of others or conduct so reckless as to amount to such disregard, with regard to Ms. Daniels' protected rights under NYCHRL § 8-107, for which Ms. Daniels seeks punitive damages.

**COUNT 8**

**New York City Human Rights Law
NYCHRL § 8-107, et seq.
Constructive Discharge Because of Sex and/or Gender Identity**

282.    Ms. Daniels incorporates by reference the preceding paragraphs as if fully set forth herein.

283.    Ms. Daniels is a member of a protected category with regard to sex, sexual orientation and/or gender identity.

284.    The effect of Speyer's acts complained of above was to create an intolerable work environment.

285.    Ms. Daniels perceived the working environment to be intolerably hostile.

286.    A reasonable transgender person in Ms. Daniels' circumstances would perceive the working environment to be intolerably hostile.

287.    Speyer was on notice of the hostile work environment, including actual notice by means of complaints made by Ms. Daniels to the school as detailed herein.

288.    The effect of the intolerable work environment was such that Ms. Daniels' resignation was not voluntary and amounts to a constructive discharge by Speyer.

289.     As a direct and proximate result of Speyer's unlawful constructive discharge, Ms. Daniels incurred damages including but not limited to lost wages, humiliation, loss of enjoyment of life, emotional distress, physical injury, damage to their professional reputation, and other pecuniary and non-pecuniary losses, which damages would not have occurred but for Defendants' discrimination.

290.     By engaging in the conduct described above, Speyer caused Ms. Daniels' constructive discharge by creating an intolerable work environment intentionally, knowingly or recklessly with regard to Ms. Daniels' federally and state protected rights, for which Ms. Daniels seeks punitive damages.

COUNT 9

NYCHRL §8-101(a)
Retaliation

291.     Ms. Daniels incorporates by reference the preceding paragraphs as if fully set forth herein.

292.     The effect of Defendant's acts complained of above was to deprive Ms. Daniels of equal employment opportunities as an employee because of retaliation for their complaints of discrimination in violation of NYCHRL § 8-107, et seq.

293.     By complaining to Defendant about the discriminatory practices and hostile work environment described herein and opposing said practices and hostile work environment directed at them, Ms. Daniels engaged in activities protected by NYCHRL § 8-107, et seq.

294.     Ms. Daniels's exercise of protected rights was known to Defendant, because the complaints were made to Defendant during their employment.

295.     The action taken against Ms. Daniels up to and including their investigation, forced administrative leave and constructive discharge, were reasonably likely to deter a person from engaging in protected activities.

296.     Defendant is directly liable for the deprivation of Ms. Daniels' rights by exercising its authority to retaliate against them for their protected activities.

297.     Defendant aided and abetted in the deprivation of Ms. Daniels' rights because of retaliation against them for their protected activities by actually participating in the conduct giving rise to their claim for retaliation.

298.     As a direct and proximate result of Defendant's unlawful retaliation, Ms. Daniels has incurred damages including but not limited to lost wages, humiliation, loss of enjoyment of life, emotional distress, damage to professional reputation, and other pecuniary and non-pecuniary losses.

299.     By engaging in the conduct described above, Defendant terminated Ms. Daniels intentionally, knowingly or recklessly with regard to Ms. Daniels' federally and state protected rights, for which Ms. Daniels seeks punitive damages.


### JURY DEMAND

Ms. Daniels requests a jury trial on all issues to be tried.


**WHEREFORE**, Ms. Daniels respectfully requests a judgment against Speyer:

A.     Declaring that Speyer engaged in unlawful employment practices prohibited by Title VII, the NYSHRL and the NYCHRL in that it discriminated against Ms. Daniels on the basis of her sex and/or gender.

B.      Awarding damages to Ms. Daniels for all lost wages and benefits resulting from Speyer's unlawful discrimination and to otherwise make her whole for any losses suffered as a result of such unlawful employment practices;

C.      Awarding Ms. Daniels compensatory damages for mental and emotional injury, distress, pain and suffering and injury to her reputation in an amount to be proven;

D.      Awarding Ms. Daniels punitive damages;

E.      Awarding Ms. Daniels attorneys' fees, costs, disbursements, and expenses incurred in the prosecution of the action;

F.      Enjoining Speyer to revise its employment practices and procedures to educate all employees on transgender and nonbinary people and the issues they face, best practices for what is and is not acceptable to say or ask in response to discovering a person is transgender, that physical touching of a transgender teacher in a sexualized manner is inappropriate, and forbidding any behavior that targets or shames a person on the basis of sex, sexual orientation or gender expression.

G.      Awarding Ms. Daniels such other and further relief as the Court may deem equitable, just and proper to remedy Speyer's unlawful employment practices.

Dated: May 10, 2021

Respectfully Submitted,

/s/ Jillian T. Weiss
Jillian T. Weiss
LAW OFFICE OF JILLIAN T. WEISS, P.C.
442 15th Street No. 1R
Brooklyn, NY 11215
Tel: (845) 709-3237
Fax: (845) 684-0160
Email: jweiss@jtweisslaw.com

*Attorney for the Plaintiff*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 10th day of May, 2021, a true and correct copy of

the foregoing was served on all counsel or parties of record through CM/ECF.

_/s/_     _Jillian T. Weiss_
Jillian T. Weiss
LAW OFFICE OF JILLIAN T. WEISS, P.C.
442 15th Street No. 1R
Brooklyn, New York 11215
Tel:    (845) 709-3237
Fax:    (845) 684-0160
Email: jweiss@jtweisslaw.com

_Attorney for Plaintiff_